2012 UT 4

**ALLIANT TECHSYSTEMS, INC., Petitioner and Appellant,**

v.

**SALT LAKE COUNTY BOARD OF EQUALIZATION, Utah State Tax Commission, and Granite School District, Respondents and Appellees.**

No. 20100029.

Supreme Court of Utah.

Jan. 20, 2012.

Mark L. Shurtleff, Att'y Gen., John C. McCarrey, Laron J. Lind, Assistant Att'ys Gen., Salt Lake City, for appellee Utah State Tax Commission.

Mary Ellen Sloan, Kelly W. Wright, Salt Lake City, for appellee Salt Lake County Board of Equalization.

John E.S. Robson, Robert G. Crockett, Salt Lake City, for appellee Granite School District.

David J. Crapo, Douglas C. Smith, Salt Lake City, for appellant.

Associate Chief Justice DURRANT, opinion of the Court:

## INTRODUCTION

¶ 1 In this appeal, we are asked to interpret section 59–4–101 of the Utah Code (the Privilege Tax Statute or the Statute). The Privilege Tax Statute provides that an entity may be taxed on the privilege of beneficially using or possessing property in connection with a for-profit business, when the owner of that property is exempt from taxation.[1] But the privilege tax may not be imposed unless the entity using or possessing the exempt property has "exclusive possession" of that property.[2] In this case, we must interpret the meaning of the phrase "exclusive possession." Specifically, we must determine whether the legislature intended "exclusive possession" to mean exclusive as against *all* parties, or exclusive as against all parties *except* the property owner.

¶ 2 This issue is before us because Alliant Techsystems, Inc. (ATK) challenged the imposition of a privilege tax on its use of government property. The district court granted summary judgment against ATK and concluded that ATK had "exclusive possession" of federal government property because there was "no evidence or argument that anyone other than the [government], the landowner, had any possession, use, management, or control of the [government] [p]roperty."

¶ 3 On appeal, ATK argues that the district court's grant of summary judgment should be reversed for two reasons. First, it contends that the court erred in concluding

that "exclusive possession" means exclusive as to third parties only such that the property owner's retained control is irrelevant. Second, it argues that if "exclusive possession" means exclusive as to third parties only, then it has standing to assert that the privilege tax violates the Supremacy Clause of the United States Constitution (the Supremacy Clause) because the tax is assessed on the full value of the property, including the portion that is controlled by the federal government.

¶ 4 We hold that, under the Privilege Tax Statute, "exclusive possession" means exclusive as to all parties, including the property owner. Thus, exclusive possession exists when an entity has the present right to occupy and control property akin to that of an owner or lessee. Because the record before us indicates disputed material facts regarding ATK's authority to control the government property, we conclude that summary judgment was inappropriate in this case. Further, we decline to address whether ATK has standing to assert a Supremacy Clause challenge because our definition of "exclusive possession" forecloses ATK's argument.

## BACKGROUND

¶ 5 ATK is a for-profit corporation that manufactures aerospace and defense products for private companies and the United States government. To fulfill its aerospace and defense contracts, ATK operates on its own property as well as on property owned by the United States government. Specifically, ATK uses the Naval Industrial Reserve Ordinance Plant (NIROP), property that is owned by the U.S. Navy (the Navy). NIROP is comprised of six parcels that include approximately 528 acres of land and 181 improvements. ATK uses NIROP according to the terms of a facilities use agreement.[3]

### I. THE NIROP FACILITIES USE AGREEMENT

¶ 6 The facilities use agreement states that ATK is to "give first priority of use for the

---

**1.** *See* Utah Code § 59–4–101(1)(a).

**2.** *Id.* § 59–4–101(3)(e).

**3.** The facilities use agreement provides that "the terms and conditions of this facilities use contract shall apply to [the NIROP] facilities ... for the [c]ontractor's use in performance of contracts or subcontracts."

[NIROP] facilities ... to work on behalf of [the Navy]." Thus, ATK must get permission from the Navy "in writing" to use the property in a manner outside that contemplated in the facilities use agreement. In addition, the agreement provides that ATK "must obtain [the Navy's] approval before making either capital modifications to or usage changes of facilities." The agreement also states that ATK "agrees to use, maintain, account for, and dispose of [the NIROP] facilities" and that "[t]he [g]overnment will provide no maintenance, repair, rehabilitation, or replacement" of the property.

¶ 7 Further, the agreement states that certain NIROP facilities shall be provided for a period of five years, with other facilities provided for a period of one year, "unless extended by mutual agreement of the parties." But the agreement requires that the Navy conduct an annual review of the NIROP facilities available to ATK "for a current determination as to the continued requirement for retention." And pursuant to the agreement, the Navy may review and modify the facilities "at more frequent intervals if deemed necessary."

## II. SALT LAKE COUNTY ASSESSED ATK A PRIVILEGE TAX

¶ 8 Under the Privilege Tax Statute, a tax may be assessed "on the possession or other beneficial use enjoyed by any person of any real or personal property which for any reason is exempt from taxation, if that property is used in connection with a business conducted for profit."[4] The Statute allows the imposition of the tax in the same amount as the property tax that would have been assessed if the property were not exempt and the beneficial user or possessor were the owner of the property.[5] Pursuant to the statutory requirements, Salt Lake County determined that ATK was using tax-exempt property belonging to the federal government and that the use of this exempt property was in connection with a for-profit business. Thus, in 2000, Salt Lake County assessed ATK a privilege tax on its benefi-

cial use of the NIROP property. Salt Lake County calculated the amount of the privilege tax to be assessed based on the value of the NIROP property.

## III. ATK CHALLENGED THE PRIVILEGE TAX ASSESSMENT

¶ 9 ATK challenged the privilege tax assessment to the Salt Lake County Board of Equalization (the Board) and later to the Utah State Tax Commission (the Commission). In both challenges, ATK argued that it was exempt from the privilege tax because it qualified for an exemption under section 59–4–101(3)(e) of the Utah Code. That exemption provides that "[a privilege] tax is not imposed ... on ... the use or possession of any lease, permit, or easement unless the lease, permit, or easement entitles the lessee or permittee to exclusive possession of the premises to which the lease, permit, or easement relates" (the Nonexclusive Possession Exemption or the Exemption).[6] Based on this language, ATK asserted that it did not have "exclusive possession" of NIROP because the Navy maintained management and control over the property. After both the Board and the Commission rejected ATK's argument and upheld the tax assessment, ATK challenged the ruling in the Third District Court.

¶ 10 At the district court, ATK filed a motion for summary judgment based on two arguments. First, ATK asserted that it was exempt from the privilege tax because it did not have "exclusive possession" of NIROP due to the Navy's retained management and control over the property. Second, ATK argued that if exclusive possession means exclusive as to third parties only, then a privilege tax on the full value of the exempt property violates the Supremacy Clause because it taxes the government's retained property interest.

¶ 11 To support its position that it did not have "exclusive possession" of NIROP, ATK relied on an affidavit to assert that it "has no

---

4. UTAH CODE § 59–4–101(1)(a).

5. *Id.* § 59–4–101(2).

6. UTAH CODE § 59–4–101(3)(e).

authority to exclude the [Navy] or anyone authorized by the [Navy] from entering NIROP or using NIROP facilities." ATK further stated that the Navy "has direct management responsibility for NIROP," "tells ATK what it can and cannot do with NIROP property," and "can and does refuse to give permission to ATK to use NIROP property." According to ATK, the Navy rigorously controls ATK's use of NIROP by requiring ATK to "give first priority of use of NIROP to work on behalf of Navy programs" and to obtain "written permission" from the Navy to "use NIROP property other than as directed by the [f]acilities [u]se [agreement]."

¶ 12 The Board also filed a motion for summary judgment, arguing that "exclusive possession" under the Exemption means exclusive as against third parties only, and that the government's retained right to control the property is therefore irrelevant. Based on this interpretation, the Board contended that ATK was in "exclusive possession" of NIROP because no other entity, besides the Navy, had any control over the property.[7] In addition, the Board used testimony and ATK's subcontracts to assert that ATK is entitled to use NIROP on a "rent-free non-interference basis" and that "ATK controls who enters its NIROP facility." The Board also asserted that ATK could use 165 improvements on NIROP for a period of five years. Further, the Board emphasized that the facilities use agreement charges ATK with "all maintenance, repair, rehabilitation, or replacement of" the NIROP facilities.

¶ 13 After receiving both motions for summary judgment, the district court accepted all the asserted facts and granted summary judgment in favor of the Board. The district court first concluded that ATK used NIROP pursuant to a permit.[8] Additionally, the district court held that "ATK was in exclusive possession of [the NIROP property] ... even though the landowner, the Navy, retained traditional levels of management and control." In support of this conclusion, the dis-

trict court noted that there was "no evidence or argument that anyone other than the Navy, the landowner, had any possession, use, management, or control of the NIROP [p]roperty."

¶ 14 Regarding ATK's argument that the privilege tax violated the Supremacy Clause by unconstitutionally taxing government property, the district court held that ATK lacked standing to raise such a challenge on behalf of the United States government. In dicta, however, the district court stated that the privilege tax did not violate the Supremacy Clause.

## IV. ATK APPEALS THE DISTRICT COURT'S DECISION

¶ 15 ATK appeals the district court's ruling to this court. On appeal, ATK contends that the district court's grant of summary judgment should be reversed for two reasons. First, it asserts that the district court erred in interpreting "exclusive possession" to mean exclusive as against third parties only. Second, it argues that the district court erred in holding that ATK lacked standing to raise a Supremacy Clause challenge because under the district court's interpretation of "exclusive possession," ATK is personally injured by paying a tax that unconstitutionally taxes the federal government. In contrast, the Board contends that the district court correctly interpreted "exclusive possession" to mean exclusive as to third parties only and correctly concluded that ATK lacks standing to raise a Supremacy Clause challenge.

¶ 16 We have jurisdiction to hear this appeal pursuant to section 78A–3–102(3)(j) of the Utah Code.

## STANDARD OF REVIEW

¶ 17 "We review the district court's decision to grant summary judgment for correctness, granting no deference to the [district] court."[9] We affirm a grant of sum-

---

7. The Board asserted that "no other business has a facilities use contract with the [Navy] that grants access to and use of NIROP."

8. A permit is defined as "[a] certificate evidencing permission; a license." Black's Law Dictionary 1255 (9th ed. 2009).

9. *Gudmundson v. Del Ozone*, 2010 UT 33, ¶ 10, 232 P.3d 1059 (alteration in original) (internal

mary judgment when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [10] A district court's interpretation of a statute is a question of law, which we also review for correctness. [11]

## ANALYSIS

■ ¶ 18 Under the Privilege Tax Statute, a tax may be imposed "on the possession or other beneficial use enjoyed by any person of any real or personal property which for any reason is exempt from taxation, if that property is used in connection with a business conducted for profit." [12] To be assessed a privilege tax, three statutory criteria must be satisfied. [13] First, the property being used or possessed "must be of the type that ordinarily is exempt from taxation." [14] Second, "the property must be used [or possessed] by a private individual, association, or corporation in connection with a for-profit business." [15] Finally, the use or possession of the property cannot fall into one of the Privilege Tax Statute's exemptions. [16] In relevant part, the exemption at issue in this case provides that a privilege tax will not be imposed on the use or possession of exempt property when the user or possessor has less than exclusive possession of the property. [17]

¶ 19 Here, ATK concedes that the first two criteria are met for assessing a privilege tax: (1) NIROP is otherwise exempt from taxation because it is property of the United States government, [18] and (2) ATK uses this property in connection with a for-profit business. Thus, we must determine only whether the district court erred in concluding that ATK's use of NIROP did not qualify under the Nonexclusive Possession Exemption. To make this determination, we must address two issues. First, we must decide whether the district court correctly interpreted the Nonexclusive Possession Exemption. Second, we must decide whether, on the present state of the record, the undisputed material facts demonstrate that ATK had "exclusive possession" of NIROP such that summary judgment was appropriate.

## I. THE DISTRICT COURT ERRED IN INTERPRETING THE NONEXCLUSIVE POSSESSION EXEMPTION BECAUSE "EXCLUSIVE POSSESSION" MEANS HAVING THE SAME PRESENT RIGHT TO OCCUPY AND CONTROL PROPERTY THAT AN OWNER OR LESSEE WOULD HAVE

¶ 20 Under the Nonexclusive Possession Exemption, a privilege tax will not be imposed on "the use or possession of any lease, permit, or easement *unless* the lease, permit, or easement entitles the lessee or permittee to *exclusive possession* of the premises to which the lease, permit, or easement relates." [19] Because the Statute does not provide a definition for the terms "lease," "permit," "easement," or the phrase "exclusive possession," we must use our tools for statutory interpretation to determine their meaning.

10. UTAH R. CIV. P. 56(c).

11. *MacFarlane v. Utah State Tax Comm'n*, 2006 UT 25, ¶ 9, 134 P.3d 1116.

12. UTAH CODE § 59–4–101(1)(a).

13. *See Interwest Aviation v. Cnty. Bd. of Equalization*, 743 P.2d 1222, 1224 (Utah 1987).

14. *Id.*

15. *Id.*

16. *See id.; see also* UTAH CODE § 59–4–101(3) (listing seven exemptions to assessment of a privilege tax).

17. *See* UTAH CODE § 59–4–101(3)(e) ("A [privilege] tax is not imposed ... on ... the use or possession of any lease, permit, or easement unless the lease, permit, or easement entitles the lessee or permittee to exclusive possession of the premises to which the lease, permit, or easement relates.").

18. *See id.* § 59–2–1101(3)(a)(I) ("The following property is exempt from taxation ... property exempt under the laws of the United States[.]"); *see also Thiokol Chem. Corp. v. Peterson*, 15 Utah 2d 355, 393 P.2d 391, 393 (1964) (noting that the state of Utah cannot impose a tax upon the United States or its agents).

19. UTAH CODE § 59–4–101(3)(e) (emphases added).

¶ 21 When interpreting a statute, our primary objective "is to give effect to the legislature's intent."[20] To discern legislative intent, we look first to the statute's language.[21] In so doing, "[w]e presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning."[22] Additionally, we read the text of a statute as a whole and interpret its provisions in harmony with other subsections.[23] "When the ... meaning of [a] statute can be discerned from its language, no other interpretive tools are needed."[24] But where the language of a statute is ambiguous, we may look beyond the statute's text in order to ascertain its legislative purpose.[25]

¶ 22 On first glance, it is difficult to discern the meaning of the term "exclusive possession" by examining the text of the Nonexclusive Possession Exemption. By pairing the terms "lease," "permit," and "easement" with the phrase "exclusive possession," the Exemption suggests that all of these instruments may convey "exclusive possession" of property. But this suggestion is problematic because we have consistently recognized that permits and easements *do not* convey any possessory interest in property, much less an exclusive possessory interest.[26] Because the pairing of these terms cannot be reconciled, the legislature must have intended for either "permit" and "easement" to be read outside their ordinary definition or for "exclusive possession" to have a different meaning.

¶ 23 The application of our tools for statutory interpretation makes clear, however, that the legislature intended that "exclusive possession" have its ordinary and accepted meaning.[27] Indeed, this intent is

---

20. *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135 (internal quotation marks omitted).

21. *Id.*

22. *Harold Selman, Inc. v. Box Elder Cnty.*, 2011 UT 18, ¶ 18, 251 P.3d 804 (alteration in original) (internal quotation marks omitted).

23. *Id.*

24. *Id.* (internal quotation marks omitted).

25. *See Martinez v. Media–Paymaster Plus/Church of Jesus Christ of Latter-Day Saints*, 2007 UT 42, ¶ 47, 164 P.3d 384.

26. A permit conveys only "permission or authority to engage in a particular act or series of acts upon the land of another *without possessing an[y] interest therein* and is subject to the management and control retained by the owner." *Keller v. Southwood N. Med. Pavilion, Inc.*, 959 P.2d 102, 107 (Utah 1998) (emphasis added) (citation omitted) (internal quotation marks omitted). And an easement is a nonpossessory interest in land owned by another person, consisting of the right to use the land. *See Osguthorpe v. Wolf Mountain Resorts, L.C.*, 2010 UT 29, ¶¶ 24, 27, 232 P.3d 999.

27. In this respect, we disagree with Chief Justice Durham's position that the legislature intended for the term "possession" to have a special meaning within the Exemption. *Infra* ¶ 43. First, we are not persuaded that the definition of "possession" in the Exemption's second sentence controls our interpretation of the term in the first sentence, *see infra* ¶ 43, because the first sentence relates to *any* lease, permit or easement and the second sentence concerns only the con-

veyance of *mineral rights. See* Utah Code § 59–4–101(3)(e); *see also infra* ¶ 41 ("The second sentence of the Exemption indicates that—*at least with respect to mineral extraction*—the term 'possession' has a special meaning." (emphasis added)). Indeed, this case does not implicate the Exemption's second sentence because ATK does not have any mineral rights in the NIROP property. We therefore do not foreclose a future interpretation of the Exemption's second sentence and do not render that portion inoperative. *See infra* ¶ 42. Further, for situations that involve mineral rights, special definitions or meanings may be appropriate because "[m]ining, oil and gas agreements are unique" in that they are not susceptible to traditional real property law. *Heiner v. S.J. Groves & Sons Co.*, 790 P.2d 107, 113 (Utah Ct.App.1990); *see also id.* ("[T]he nature of a mineral lease bears little similarity to a real property lease and its purpose differs."); *id.* at 114 ("The real property landlord-tenant approach to the assignment-sublease distinction in the area of mineral leases has confused more than clarified what parties intended in these [types of] transactions."). Because mineral rights agreements are not amenable to real property law, a special meaning of "possession" may be appropriate with respect to mineral extraction. But even though the legislature crafted a special meaning for "possession" with respect to mineral rights, there is no indication that the term has a special meaning outside that limited context. Indeed, as explained above, our tools for statutory interpretation make clear that, outside of the mineral rights context, the legislature intended "exclusive possession" to have its ordinary meaning.

Second, we are not inclined to interpret "possession" as "use" simply because some subsec-

apparent when we read the Exemption in harmony with other provisions of the Statute. Specifically, subsection (2) of the Privilege Tax Statute provides that "[t]he [privilege] tax imposed ... is the same amount that the ad valorem property tax would be *if the possessor or user were the owner of the property.*"[28] Because the tax is imposed as if the possessor or user were the owner of the property, it appears that the legislature was concerned with taxing an entity whose use of exempt property was akin to that of an owner. And it is well recognized that an owner traditionally has rights to use and possess property to the exclusion of others.[29] Accordingly, we conclude that the legislature intended for "exclusive possession" to be read according to its ordinary and accepted meaning.[30]

¶ 24 We are convinced that the legislature intended the phrase "exclusive possession" to mean exclusive as against *all* parties, including the property owner. The term "exclusive" means "not divided or shared with others"[31] and is used in the Exemption without any qualification. In addition, the term "possession" means "2. The right under which one may exercise control over something ... 4. Something that a per-

son owns."[32] And one with possession of property has the right "to exclude other members of society in general from any present occupation of the land."[33] Because we read "exclusive" and "possession" according to their ordinary and accepted meanings, we hold that regardless of whether the parties label the instrument conveying the property a "permit," "easement," or "lease," the legislature intended the phrase "exclusive possession" to encompass exclusivity against all parties, including the landowner. Further, because the Statute taxes a user or possessor of exempt property at the same rate as it would a fee simple owner of nonexempt property,[34] we conclude that the legislature intended to tax those who use or possess, in a manner akin to an owner, property that is exempt from taxation.

¶ 25 Thus, interpreting the Exemption in a way that best effectuates legislative intent, we conclude that "exclusive possession" must mean the same present right to occupy and control property that would exist for a fee simple owner of that property. Such a present right to occupy and control property occurs when a user or possessor operates under a lease.[35] Indeed, we have recognized

---

tions of the Statute pair the terms together. *See infra* ¶ 44. Instead, we find it significant that the Exemption itself narrows taxation simply to those in exclusive "possession." *See* Utah Code § 59-4-101(3)(e). Thus, even if "use" and "possession" are interchangeable in some portions of the Privilege Tax Statute, the text of the Exemption makes clear that, under this provision, the legislature did not intend for "possession" to be collapsed into "use." *See, e.g., Johnson v. United States,* ── U.S. ──, 130 S.Ct. 1265, 1275, 176 L.Ed.2d 1 (2010) ("[W]here [the legislature] includes particular language in one section of a statute but omits it in another ..., it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion." (first alteration in original) (internal quotation marks omitted)). For the foregoing reasons, we reject Chief Justice Durham's position to interpret "possession" as meaning "use."

28. Utah Code § 59-4-101(2) (emphasis added).

29. *See, e.g., Ritholz v. City of Salt Lake,* 3 Utah 2d 385, 284 P.2d 702, 705 (1955) ("Clearly among the rights attendant upon ownership and enjoyment of property are the rights to exchange, pledge, sell or otherwise dispose of it—rights which must be adequately protected.").

30. In addition, we have recognized that "a court is not bound by the parties' characterization of their transaction or by any title they may have given a writing." *Keller,* 959 P.2d at 107. Thus, to the extent that a party describes an instrument as a lease, permit, or easement, we are not bound by that characterization. *See id.*

31. The American Heritage Dictionary of the English Language 458 (1980); *see also Loyal Order of Moose, # 259 v. Cnty. Bd. of Equalization,* 657 P.2d 257, 262 (Utah 1982) (recognizing that "exclusive" means "singl[e]" or "sole[ ]").

32. Black's Law Dictionary 1281 (9th ed. 2009).

33. *Osguthorpe,* 2010 UT 29, ¶ 25, 232 P.3d 999 (internal quotation marks omitted).

34. *See* Utah Code § 59-4-101(2).

35. *See* 49 Am Jur 2d *Landlord and Tenant* § 21 (1996) ("To create a leasehold estate, the tenant must be vested with *exclusive possession* of the property to the lessee, even against the owner of the fee." (emphasis added)); Cornelius J. Moynihan & Sheldon F. Kurtz, Moynihan's Introduction to The Law of Real Property 87 (4th ed. 2005) (stat-

that a lessee has a present possessory interest in property, with the present right to occupy and control property akin to that of the owner.[36]

¶ 26 This interpretation—that "exclusive possession" means the same present right to occupy and control property that would exist for an owner or lessee—is consistent with the stated legislative purpose in enacting the Privilege Tax Statute. Indeed, we have recognized that, in codifying the Statute, the legislature intended to "close any gaps in the tax laws between those who possess or use exempt property for a profit and those who possess or use nonexempt property for a profit."[37] By taxing entities whose use of exempt property is akin to that of an owner, the Statute eliminates any incentive for businesses to "use exempt property in connection with a for-profit business [but] pay less tax than an owner of nonexempt property."[38]

■■■■ ¶ 27 Further, our interpretation is also in line with constitutional principles that "a use tax may be valid only to the extent that it reaches the contractor's inter-

est in [g]overnment-owned property."[39] Indeed, the Supremacy Clause of the United States Constitution provides that a state may not tax the federal government or its property directly.[40] But when an entity has "exclusive possession," meaning the present right to occupy and control the property akin to that of an owner or consistent with a lessee, then no part of a privilege tax assessed against that entity falls directly on the government or the government's retained property interest.[41]

■■■■ ¶ 28 For the foregoing reasons, we conclude that "exclusive possession" means having the present right to occupy and control property akin to that of an owner or consistent with a lessee. To qualify as exclusive possession, the user or possessor must have this right over a definite space for a definite time.[42] While not an exhaustive list, examples of the type of control needed for exclusive possession include (1) the general power to admit or exclude others, including the property owner, from any present occu-

ing that the "distinctive feature" of a lease is "the right of the tenant to exclusive possession of a defined physical area for the duration of the specified term").

**36.** *See Osguthorpe*, 2010 UT 29, ¶¶ 25, 29, 232 P.3d 999 (providing that a defining characteristic of a lease is that it transfers "exclusive possession" of the property such that the lessee has the right "to exclude other members of society in general from any present occupation of the land" (internal quotation marks omitted)); *Keller*, 959 P.2d at 107 ("A lease must convey a definite space and must transfer exclusive possession of that space to the lessee.").

**37.** *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 23, 211 P.3d 382 (emphases omitted) (internal quotation marks omitted).

**38.** *Id.* ¶ 26.

**39.** *United States v. New Mexico*, 455 U.S. 720, 741 n. 14, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982).

**40.** *See United States v. Twp. of Muskegon*, 355 U.S. 484, 485–86, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958); *United States v. City of Detroit*, 355 U.S. 466, 470, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 435–36, 4 L.Ed. 579 (1819); *see also Thiokol Chem. Corp. v. Peterson*, 15 Utah 2d 355, 393 P.2d 391, 393 (1964) ("It is stated that if the tax

is directly upon the United States or an agency thereof, it is invalid. But the converse is also true: if the tax falls upon another, the fact that the tax might indirectly fall upon the United States does not render it invalid." (footnote omitted)).

**41.** In this respect, our interpretation of "exclusive possession" forecloses ATK's Supremacy Clause challenge. ATK argued that if "exclusive possession" means exclusive as to third parties only, then the privilege tax violates the Supremacy Clause by taxing ATK on the full value of the property, including the portion that is controlled by the government. But where "exclusive possession" is akin to that of a lessee or owner, and an entity has exclusive possession of the property, then a privilege tax does not tax any portion of the government property interest directly. Thus, there is no potential Supremacy Clause violation. Because our interpretation forecloses ATK's Supremacy Clause challenge, we need not address whether ATK has standing to make such an argument. This is because, when possible, we decline to address issues beyond the narrowest applicable grounds. *See Gallivan v. Walker*, 2002 UT 89, ¶ 97, 54 P.3d 1069 (Durham, C.J., concurring) ("[C]ourts should generally resolve cases on the narrowest applicable grounds unless specific reasons exist for offering broader guidance.").

**42.** *See, e.g., Osguthorpe*, 2010 UT 29, ¶¶ 25, 29, 232 P.3d 999; *Keller*, 959 P.2d at 107.

pation of the property [43] and (2) the authority to make broad use of the property, with only narrow exceptions.[44] For instance, in *Osguthorpe v. Wolf Mountain Resorts, L.C.*, we held that a resort did not have exclusive possession of certain property because the resort's use of that property was limited and the resort was not allowed to exclude others.[45] In addition, the owner had the right to continue to access and use the property for his own purposes.[46] Because the resort did not have sufficient control over its own use of the property, or any control over the owner's access and use, we held that the resort did not have possession of the property, let alone exclusive possession.[47]

¶ 29 In contrast to the definition provided above, the district court appears to have interpreted "exclusive possession" as meaning exclusive control as against third parties only. Thus, it appears that the district court viewed the Navy's retained control over NIROP to be irrelevant. For instance, in concluding that ATK had exclusive possession of the NIROP property, the district court stated that there was "no evidence or argument that anyone *other than the Navy*, the landowner, had any possession, use, management, or control" of the property. But contrary to the district court's apparent position, there is nothing in the Exemption to suggest that exclusive possession means exclusive as to third parties only. Indeed, as discussed above, the legislature used the term "exclusive" without any qualification. Further, our case law evaluating exclusive possession has included an examination of the owner's retained right to control the property.[48] We

therefore conclude that to the extent that the district court interpreted "exclusive possession" as meaning exclusive control against third parties only, the district court erred.

¶ 30 For the foregoing reasons, we hold that under the Nonexclusive Possession Exemption, courts must examine whether the user or possessor has a present right to occupy and control the exempt property akin to that of an owner or lessee. This determination requires the court to examine the owner's retained right to occupy and control the property. Because the district court apparently interpreted exclusive possession as exclusive against third parties only, we conclude that the district court erred.

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT BECAUSE THE RECORD INDICATES GENUINE ISSUES OF MATERIAL FACT REGARDING ATK'S CONTROL OF NIROP

¶ 31 Having defined "exclusive possession," we must now determine whether the district court was correct in granting summary judgment. Under rule 56 of the Utah Rules of Civil Procedure, summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." A disputed fact is material if it "affects the rights or liabilities of the parties." [49] Further, in reviewing the material facts on appeal, we are limited to the facts as provided in the record.[50]

**43.** *See Osguthorpe*, 2010 UT 29, ¶¶ 25, 29, 232 P.3d 999; *see also* RESTATEMENT (FIRST) OF PROPERTY § 7 (1936) (stating that a possessory interest in land entitles a user to "a certain degree of physical control over the land ... [including the right] to exclude other members of society in general from any present occupation of the land").

**44.** *See Keller*, 959 P.2d at 107; *see also Osguthorpe*, 2010 UT 29, ¶¶ 25, 29, 232 P.3d 999 (recognizing that a user has exclusive possession of property if his ability to use the space is broad and generally undefined with only narrow limitations).

**45.** 2010 UT 29, ¶ 27, 232 P.3d 999 (stating that because the resort could build only certain infrastructure on the property, it was "limited ... in

its use of the land, which is characteristic of a nonpossessory interest").

**46.** *See id.* ¶¶ 27–28.

**47.** *See id.* ¶ 29.

**48.** *See id.* ¶¶ 27–29.

**49.** *Holland v. Columbia Iron Mining Co.*, 4 Utah 2d 303, 293 P.2d 700, 709 (1956) (Wade, J., dissenting in part).

**50.** *See Poteet v. White*, 2006 UT 63, ¶ 8, 147 P.3d 439 ("'[O]ur task in this appeal is to examine the record and determine whether it establishes at least a dispute of [material] fact....'").

¶ 32 In this case, based on the state of the record before us, we conclude that summary judgment was inappropriate because there are genuine issues of material fact regarding ATK's and the Navy's control of NIROP. Both ATK and the Board presented the district court with conflicting facts about who had control over the NIROP property. Nonetheless, the district court adopted both sets of facts and concluded that ATK had exclusive possession of NIROP because there was "no evidence or argument that anyone *other than the Navy,* the landowner, had any possession, use, management, or control of the NIROP [p]roperty." But as we have explained above, a determination of exclusive possession requires the court to examine the extent of the property owner's retained right to control the property. Thus, to the extent the district court concluded that disputed facts regarding ATK's and the Navy's control of NIROP were immaterial, the district court erred.

¶ 33 Because the issue is whether ATK has exclusive possession—meaning the same present right to occupy or control property that an owner or lessee would have—a fact is material if it affects this determination. To have the same present right to occupy or control property as an owner or lessee, an entity must have the power to exclude the property owner from occupying the property, the authority to make broad use of the property (with narrow exceptions only), and power over a definite space for a definite time. Here, the record indicates genuine issues as to the following material facts: (1) whether ATK has the authority to exclude the Navy from any present occupation of NIROP, (2) the extent of ATK's authority to use NIROP, and (3) whether ATK has been granted a definite space for a definite time.

¶ 34 First, the record shows a genuine issue regarding the material fact of whether ATK has the authority to exclude others, including the Navy, from presently occupying NIROP. Indeed, the facilities use agreement—which governs ATK's use of NIROP—is silent about whether the Navy has the present right to occupy NIROP. In fact, the facilities use agreement is silent about who even controls access to NIROP and whether ATK has the power to exclude the Navy from the property. In its memorandum in support of summary judgment, however, the Board used testimony and ATK's subcontracts to assert that "ATK controls who enters its NIROP facility." Therefore, based on the Board's facts, ATK has the power to exclude others from NIROP. In contrast, in its own motion for summary judgment, ATK relied on an affidavit to assert that it "has no authority to exclude the [Navy] or anyone authorized by the [Navy] from entering NIROP or using NIROP facilities" and that the Navy "can and does refuse to give permission to ATK to use NIROP property." Thus, ATK asserted that it does not have the power to exclude others, including the Navy, from occupying or accessing the property. Based on these conflicting assertions, the record indicates a genuine issue as to ATK's control over NIROP, especially concerning its power to exclude others, including the Navy, from occupying or even accessing the property.

¶ 35 Second, the record shows a genuine issue as to the extent of ATK's authority to use the NIROP property. The Board asserted that ATK has the legal right to use NIROP on a "non-interference basis" to fulfill contracts with entities other than the Navy. In support of its assertion that the Navy cannot interfere with ATK's use of NIROP, the Board contended that ATK uses NIROP facilities to fulfill private contracts and that "no other business has a facilities use contract with the [Navy] that grants access to and use of NIROP." In addition, the Board asserted that the Navy cannot interfere with ATK's use of NIROP because the contract charges ATK with "all maintenance, repair, rehabilitation, or replacement of" the NIROP facilities. The Board therefore argued that ATK is entitled to broad use of the NIROP property. In contrast, ATK asserted that its use of NIROP is significantly limited by the Navy's interference. Specifically, ATK argued that the Navy has the right to require that government purposes are fulfilled before ATK can use the property for other purposes and that ATK must obtain "written permission" from the Navy to "use NIROP property other than as directed by the [f]acilities

[u]se [agreement]." In addition, ATK asserted that the Navy has "direct management responsibility for NIROP" and that the Navy "tells ATK what it can and cannot do with NIROP property." Because of these conflicting assertions, the record indicates disputed material facts about the extent of ATK's authority to use the NIROP property.

¶ 36 Finally, the record shows a genuine issue as to whether ATK was granted a definite space for a definite time. The Board asserted that ATK was granted 165 improvements on NIROP for a period of five years. But the facilities use agreement suggests that the Navy could change the list of NIROP facilities that ATK was authorized to use as the Navy deemed necessary. This implies that ATK was not given a definite space for a definite time but was instead given whatever space the Navy deemed necessary for whatever time it deemed appropriate. Therefore, the record indicates a genuine dispute as to whether ATK was granted a definite space for a definite time.

¶ 37 Given the current state of the record, there are disputed issues of material fact regarding whether ATK was in exclusive possession of NIROP. We note that these factual disputes may exist in the record because this opinion represents our first opportunity to clarify what "exclusive possession" means under the Privilege Tax Statute. Now that we have defined exclusive possession, ATK and the Board should be able to develop and present facts that would be material under this newly clarified standard. In addition, as we have clarified what facts are material under an exclusive possession analysis, the district court may be able to make necessary factual determinations and resolve material ambiguities in the record. But because we are limited to the current state of the record, and because the record indicates genuine issues of material facts, we conclude that summary judgment was inappropriate.

## CONCLUSION

¶ 38 We hold that, under the Nonexclusive Possession Exemption, "exclusive possession" means exclusive as to all parties, including the property owner. Thus, exclusive possession exists when an entity has the present right to occupy and control the property akin to that of an owner or lessee. Because the record indicates disputed material facts regarding ATK's authority to control the government property, we conclude that summary judgment was inappropriate. Further, we decline to address whether ATK has standing to assert a Supremacy Clause challenge because our definition of "exclusive possession" forecloses ATK's argument. Accordingly, we remand this case to the district court.

Associate Chief Justice DURRANT authored the opinion of the Court, in which Justice PARRISH, Justice NEHRING, and Justice LEE joined.

Chief Justice DURHAM filed a concurring opinion.

Chief Justice DURHAM, concurring:

¶ 39 The majority is correct that "we must determine only whether the district court erred in concluding that ATK's use of NIROP did not qualify under" Utah Code section 59–4–101(3)(e) (the Exemption). *Supra* ¶ 19. I also agree with the majority that "[b]ecause the pairing of the[ ] terms [used in the Exemption] cannot be reconciled, the legislature must have intended for either 'permit' and 'easement' to be read outside their ordinary definition or for 'exclusive possession' to have a different meaning." *Supra* ¶ 22; *see also Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 20, 248 P.3d 465 ("Ultimately, then, this is a case where no interpretation preserves reasonable meaning for all provisions of the statutory scheme...."). Unlike the majority, however, I believe that the better interpretation of the statute is that the legislature did *not* intend "exclusive possession" to have its ordinary and accepted meaning.

¶ 40 As the majority correctly notes, we must "read the text of a statute as a whole and interpret its provisions in harmony with other subsections." *Supra* ¶ 21 (citing *Harold Selman, Inc. v. Box Elder Cnty.*, 2011 UT 18, ¶ 18, 251 P.3d 804). Here, I find it significant that the majority considers only the first sentence of the Exemption. The Exemption actually contains two sentences:

A tax is not imposed ... on ... the use or possession of any lease, permit, or easement unless the lease, permit, or easement entitles the lessee or permittee to exclusive possession of the premises to which the lease, permit, or easement relates. Every lessee, permittee, or other holder of a right to remove or extract the mineral covered by the holder's lease, right, permit, or easement except from brines of the Great Salt Lake, is considered to be in possession of the premises, notwithstanding the fact that other parties may have a similar right to remove or extract another mineral from the same lands or estates[.]

UTAH CODE § 59–4–101(3)(e). By ignoring the second sentence, the majority's approach fails to account for another important rule of statutory interpretation. Specifically, "[u]nder our rules of statutory construction, we must give effect to every provision of a statute and avoid an interpretation that will render portions of a statute inoperative." *Warne v. Warne*, 2011 UT 69, ¶ 36, — P.3d —.

¶ 41 In my view, the second sentence evinces the legislature's intent to treat possession as having a special meaning in this Exemption. The term "possession" is susceptible of many interpretations. Indeed, "both in common speech and in legal terminology, there is no word more ambiguous in its meaning than possession." *Nat'l Safe Deposit Co. v. Stead*, 232 U.S. 58, 67, 34 S.Ct. 209, 58 L.Ed. 504 (1914). The second sentence of the Exemption indicates that—at least with respect to mineral extraction—the term "possession" has a special meaning. Specifically, the Exemption sets up an evaluation of possession for each distinct mineral: multiple mineral rights holders may operate on the same land, but each may have possession with respect to the mineral covered by that right holder's lease, permit, or easement.

¶ 42 Under the majority's interpretation of the Exemption, however, this second sentence would be superfluous. The majority reads the first sentence of the Exemption to require " 'exclusive possession' to be read according to its ordinary and accepted meaning." *Supra* ¶ 23. With this interpretation, however, mineral rights holders could never be subjected to taxation under section 59–4–101, for two reasons. First, a mineral rights holder necessarily will never have a property right "akin to an owner" of property that provides "exclusivity against all parties, including the landowner." *Supra* ¶ 24. Second, the second sentence of the Exemption contemplates multiple mineral rights holders operating on the same property, which inherently eliminates any possibility of a mineral rights holder enjoying "exclusivity against all parties."

¶ 43 I would therefore read the Exemption differently so as to preserve the meaning of its second sentence. In light of what I see as the clear legislative intent to read "possession" as having a special meaning within the Exemption, I would not seek to give "exclusive possession" its ordinary and accepted meaning under our case law. *See supra* ¶ 24 (citing *Osguthorpe v. Wolf Mountain Resorts, L.C.*, 2010 UT 29, ¶ 25, 232 P.3d 999). Nor could I give "permit" or "easement" their ordinary meanings, because—as the majority correctly notes—"we have consistently recognized that permits and easements *do not* convey any possessory interest in property, much less an exclusive possessory interest." *Supra* ¶ 22. Thus I see only one way to read the Exemption in harmony with section 59–4–101 while avoiding an interpretation that would render the second sentence of the Exemption inoperative. I believe that the legislature intended taxation to hinge on whether the lease, permit, or easement provided exclusivity with respect to *use* of the property, as expressed in the terms of that grant of rights. Such a reading preserves the ordinary meanings for the terms lease, permit, and easement, while recognizing the clear legislative intent in the Exemption to give the term "possession" a special meaning.

¶ 44 The interpretation of the term "possession" in this Exemption as "use" comports with a generally accepted meaning of the term, the text of the Exemption, and the Privilege Tax Statute as a whole. First, possession generally may refer to concepts of ownership, control, or use. *See* BLACK'S LAW DICTIONARY 1281 (9th ed. 2009). In particu-

lar, possession can be used to mean "the continuing exercise of a claim to the exclusive *use* of" property. *Id.* (emphasis added). Indeed, the concept of "possession" as "use" reflects the rights flowing from an easement. *See, e.g., Oak Lane Homeowners Ass'n v. Griffin*, 2011 UT 25, ¶¶ 10, 14, 255 P.3d 677. Second, the interpretation of "possession" as "use" still allows "exclusive" to have its ordinary meaning of "not divided or shared with others." *Supra* ¶ 24 (internal quotation marks omitted). To determine whether taxation is appropriate, the taxing entity can evaluate whether the rights holder is the sole user with respect to the rights laid out in the lease, permit, or easement at issue.[1] Third, treating "possession" as "use" mirrors the Privilege Tax Statute's conflation of the two terms. In subsection (1), for example, the statute provides that "a [privilege] tax is imposed on the *possession or other beneficial use*" of property. UTAH CODE § 59–4–101(1)(a) (emphasis added). The term "possession" is paired with "use" throughout section 59–4–101.

¶ 45 This interpretation is more "consistent with the stated legislative purpose in enacting the Privilege Tax Statute." *Supra* ¶ 26. The majority correctly notes that "in codifying the Statute, the legislature intended to 'close any gaps in the tax laws between those who possess or use exempt property for a profit and those who possess or use nonexempt property for a profit.'" *Supra* ¶ 26 (quoting *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 23, 211 P.3d 382). The majority's interpretation, however, would render this basis for taxation largely inapplicable, as all non-lease arrangements would remain exempt from taxation. Under my interpretation, the legislature would more likely succeed in "eliminat[ing] any incentive for businesses to 'use exempt property in connection with a for-profit business [to] pay less tax than an owner of nonexempt property.'" *Supra* ¶ 26 (quoting *ABCO Enters.*, 2009 UT 36, ¶ 26, 211 P.3d 382). The majority's interpretation "would lead to a gap in the tax scheme" because it "would establish an incentive for an owner of exempt property

to" provide permits and easements, "and thus lower tax liability[,] and for businesses to [pay for rights] from exempt over nonexempt property owners." *ABCO Enters.*, 2009 UT 36, ¶ 26, 211 P.3d 382. "Indeed, such a gap would create a potential competitive disadvantage for businesses that [secure permits or easements] from private property owners. These are the sort of gaps that the legislature sought to avoid." *Id.* This is particularly true because tax exemptions "are matters of legislative grace and should be construed in favor of the taxing entity where legislative intent is not clear." *Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 2011 UT 54, ¶ 31, 266 P.3d 751.

¶ 46 Finally, I note that my interpretation is equally consistent "with constitutional principles that 'a use tax may be valid only to the extent that it reaches the contractor's interest.'" *Supra* ¶ 27 (quoting *United States v. New Mexico*, 455 U.S. 720, 741 n. 14, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982)). Under my interpretation, the privilege tax still extends only to the extent of the contractor's interest, as expressed in the lease, permit, or easement authorizing use of the property. The Exemption still requires a showing of exclusivity in order to tax otherwise exempt leases, permits, or easements; the inquiry merely focuses on whether the lease, permit, or easement provides for exclusive *use* of the property to which the lease, permit, or easement relates, as defined by the extent of that grant of rights.

¶ 47 Under either interpretation, however, I agree with the majority that summary judgment was inappropriate in this case. *See supra* ¶ 32. Genuine issues of material fact exist regarding ATK's use of NIROP, akin to the issues involving ATK's control of NIROP. *See supra* ¶ 33.

---

1. I thus agree with the majority that the exclusivity referred to in this Exemption means "exclusive as against *all* parties, including the property

owner," *supra* ¶ 24, and that the district court erred in this respect, *supra* ¶ 30.